1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,        )
                                     )
4            Plaintiff,              )   CR-11-385-HZ
                                     )
5       vs.                          )   November 17, 2011
                                     )
6   RASHAD SANDERS,                  )   Portland, Oregon
                                     )
7            Defendant.              )

8

9              TRANSCRIPT OF PROCEEDINGS

10        BEFORE THE HONORABLE DENNIS J. HUBEL

11      UNITED STATES DISTRICT COURT MAGISTRATE

12

13                   APPEARANCES

14   FOR THE PLAINTIFF:    Kemp Strickland
                           Assistant United States Attorney
15                         1000 SW Third Avenue, Suite 600
                           Portland, Oregon  97204
16
     FOR THE DEFENDANT:    Susan Russell
17                         Federal Public Defender's Office
                           101 Southwest Main, Suite 1700
18                         Portland, Oregon  97204

19

20

21

22

23   COURT REPORTER:       Dennis W. Apodaca, RMR
                           1000 SW Third Avenue, Room 301
24                         Portland, OR  97204
                           (503) 326-8182
25

1          (November 17, 2011)

2                    **P R O C E E D I N G S**

3          (Open court; defendant present:)

4          MR. STRICKLAND:  Good afternoon, Your Honor.  We

5   are on the record in United States versus Rashad Sanders.

6   That's case 11-385.  The case is assigned to Judge

7   Hernandez.  Kemp Strickland representing the Government

8   here.  Ms. Russell is here on behalf of the defendant.

9   She is representing him.  This is the time that

10  Ms. Russell has asked for a release hearing.

11          THE COURT:  Thank you.  Ms. Russell.

12          MS. RUSSELL:  Thank you, Your Honor.  That is

13  correct.  At this time we are here.  We have a pretrial

14  release proposal for the Court.  In particular, we are

15  asking that Mr. Sanders be allowed -- be released from

16  custody pending trial; that he be released on strict

17  conditions; in particular, that he be directed to reside

18  with his mother.  His mother is here, present in court,

19  and she is available to address the Court and the Court's

20  concerns.  Also present is Mr. Sanders' aunt.

21          So the conditions would be that he would be

22  directed to reside at his mother's residence; that he

23  would comply with any restrictions, such as electronic

24  monitoring and home detention that the Court would impose

25  on the case to ensure Mr. Sanders' compliance; that he

1    would report, as directed, to pretrial service under both

2    the standard conditions and, again, any additional

3    conditions, including to have no contact with anyone

4    involved with this charge.  I believe that's already been

5    a condition that the Court has imposed, but it certainly

6    would be an appropriate condition of his release as well.

7         I had a very quick opportunity to review the

8    Government's memorandum.  I just received it a few minutes

9    ago.  Quite a bit of the Government's memorandum addresses

10   the factual allegations in this case.  We have yet to

11   receive discovery in this matter.  We certainly have not

12   conducted any investigation, so I'm not in a position to

13   address those allegations obviously at this point.

14        But we do believe that Mr. Sanders has what I

15   would put as a minimal criminal record.  He has a felony

16   conviction for delivery from sometime ago and a couple of

17   misdemeanor convictions.  We believe he would be an

18   appropriate candidate, and I would encourage the Court to

19   release Mr. Sanders under those strict conditions that we

20   have proposed.

21        THE COURT:  Mr. Strickland.

22        MR. STRICKLAND:  Your Honor, I have provided a

23   memorandum.  I don't know if the Court has had an

24   opportunity to review it.

25        THE COURT:  I received it over the noon hour,

1    and I have read it.

2           MR. STRICKLAND:  I apologize for it being so

3    late.  It was difficult to put together in the short

4    amount of time I had.  I think the thing that I would

5    stress about Mr. Sanders is that he, although his

6    conviction -- his number of conviction is his lower, he

7    has contacts with police and law enforcement and arrests

8    for the different crimes I describe in the memorandum, and

9    also in the exhibits, is extensive.

10          What I think is particularly troubling or

11   noteworthy is his contacts with adult women involved in

12   the sex trafficking industry and particularly the level of

13   violence he has inflicted on one particular woman

14   described in the memorandum and on other minors that are

15   described in that memorandum.

16          So I view Mr. Sanders as a prolific sex

17   trafficker, someone that has existed within the community

18   for quite some time now.  I see no change in his behavior

19   over the period of time that he has been supervised and

20   all of these acts occurred during his period of

21   supervision.  This 2008 case is an older case involving

22   minors, but I can tell you there are other cases under

23   investigation.

24          So based on my memorandum and the facts that I

25   have put there, as well as the exhibits that I have

1    provided to the Court from his previous probation officers

2    and his conduct on supervision, Mr. Sanders is clearly a

3    danger to the community.  He is a danger to women and a

4    danger to children.  And based on his criminal history, he

5    is a danger and a flight risk.  He is looking at a very,

6    very lengthy sentence in this case.  For those reasons,

7    Your Honor, I would ask that he be held in custody.

8              THE COURT:  Okay.  Ms. Russell.

9              MS. RUSSELL:  Thank you, Your Honor.

10             THE COURT:  In looking at this, one of the

11   things that concerns me about your proposal is, it looks

12   like from the pretrial services' report, that he has been

13   living with his mother or father the entire time this

14   record has been amassed, and that these events that are

15   recounted in the government's memorandum opposing release

16   took place while he has been living right where you say

17   you want him to live now.  Why will things change?

18             MS. RUSSELL:  Well, if the Court had the concern

19   that that residence isn't appropriate, and again, as I

20   say, we are talking allegations here -- only

21   allegations -- then we would propose to the Court that an

22   alternative would be for Mr. Sanders to be released to the

23   halfway house.  That would be a very structured -- it

24   would be a different residence.  It would be a residence

25   that would have an incredible amount of monitoring both in

1    terms of drug and alcohol testing, in terms of his

2    whereabouts, requirements to do a job search, to comply,

3    and curfew and those kind of matters.  It would be very,

4    very restrictive.

5            THE COURT:  Does the halfway house take people

6    with charges like this?

7            PRETRIAL SERVICES REPRESENTATIVE:  Clackamas

8    County Corrections said they would house an individual

9    with sex offenses.  There is a percentage number, so would

10   I have to check with them.

11           THE COURT:  Why would this record suggest that

12   he is a good risk to suddenly change this pattern of

13   behavior that's recounted here?

14           MS. RUSSELL:  Well, I guess we have two things:

15   One, we have allegations; and two, we have a criminal

16   record.  It is our position to the Court at this time that

17   Mr. Sanders is capable of complying.  According to the

18   Government, these matters have been under investigation,

19   and indeed the allegations here date from many years ago.

20   So Mr. Sanders has remained in the community; he hasn't

21   taken off.  Certainly if he does not comply with

22   conditions, Clackamas County Halfway House will be the

23   first person to let the Court know, and he can be taken

24   back into custody.  I believe he will comply.  I believe

25   that he is capable of complying.  We have an individual,

1    and we have a number of allegations that have been

2    unsubstantiated.

3              THE COURT:  That creates a presumption against

4    release.

5              MS. RUSSELL:  Well, they certainly are cause for

6    concern.  I agree with the Government, in fulfilling its

7    responsibilities to have a look at them, but I believe,

8    given the minimal criminal record that we have, and this

9    individual's ties to the community, the serious charge

10   that he is facing, and the importance that he understands

11   in complying with all conditions of release, that we have

12   an individual that will not be engaged in criminal

13   conduct, will show up to his court appearance and will

14   participate in a meaningful manner and all restrictions

15   and obligations and programming that Clackamas County

16   Halfway House presents to him.

17             THE COURT:  My question though is, with the

18   presumption, it seems like it is incumbent upon the

19   defendant to come forward with some evidence to rebut the

20   presumption to create some question that would overcome

21   that presumption, and I am looking at this record, and I

22   am wondering what piece of evidence is it within the

23   record that you would suggest presents him in a positive

24   light.

25             MS. RUSSELL:  I have his mother and aunt here

1    who are able to address the Court, and I would ask the

2    Court defer to see if his mother could address the Court.

3    That having been said, I would like to kind of back up on

4    one issue.  We are sort of in a Catch-22.  When

5    allegations that have not been substantiated, have not

6    proceeded to convictions, are just allegations out there

7    that have been accumulated through the years, it creates a

8    very difficult situation in terms of an individual trying

9    to address those issues.  As I said, we haven't received

10   discovery yet.  Probably some of the issues we won't be

11   able to address until some time down the road in this

12   case, as we are approaching trial.  So in terms of

13   Mr. Sanders being in a position to present evidence and

14   simply have a full-blown sort of contested hearing about

15   each and every allegation that's in this case, it puts him

16   and myself at a difficult situation.

17           THE COURT:  I understand that.  Much of this

18   record, though, deals with a lot of historical things that

19   aren't the allegations leading to these particular

20   charges.  I am not seeing a history of compliance with

21   conditions of supervision.  I am not seeing a history of

22   someone who gets the message and starts to conform their

23   conduct to what society expects.  What I'm saying is the

24   opposite, is a person who basically says:  Go to hell; I

25   am going to do what I want to do.  That's what it looks

1    like in this record.  It is very difficult to see where

2    the evidence is that would suggest that he is going to

3    suddenly have this change of heart and comply with

4    conditions of release.

5              MS. RUSSELL:  If I could.

6              THE COURT:  Go ahead.

7              MS. RUSSELL:  I will call forth Mr. Sanders'

8    mother to come forward and make her comments.

9              THE COURT:  Please.  Did you want to put her on

10   the witness stand?

11             MS. RUSSELL:  My proposal is not, unless the

12   Government would so like.

13             MR. STRICKLAND:  I would prefer to have her on

14   the stand, Your Honor, if she is going to testify or talk

15   about things here.

16             MS. RUSSELL:  Okay.  If I could have a moment.

17             THE COURT:  You may.  Let me know when you are

18   ready.

19             Step forward, ma'am, and I will place you under

20   oath.  If you could please raise your right hand and

21   repeat this oath after me.

22             (The witness was duly sworn.)

23             THE COURT:  Please take the witness stand to my

24   left.  After you are seated, I will have you scoot up to

25   the microphone and adjust its height for you.  Then state

1    your full name and spell your last name for the record.

2           THE WITNESS:  Marilyn Ann Lindsay.

3    L-I-N-D-S-A-Y.

4           THE COURT:  Thank you.  Your witness, Counsel.

5           MS. RUSSELL:  Thank you.

6                     DIRECT EXAMINATION

7    BY MS. RUSSELL:

8    Q    Ms. Lindsay, what is your relationship to Rashad?

9    A    He is my son.

10   Q    Are you employed?

11   A    Yes, I am.

12   Q    Can you tell us where you work?

13   A    For the Department of Justice for the State of

14   Oregon.

15   Q    And how long have you worked there?

16   A    23 and a half years.

17   Q    And what is your current position with the Department

18   of Justice?

19   A    Child support case agent.

20   Q    Ms. Lindsay, you were present throughout your son's

21   release hearing today; is that correct?

22   A    Yes.

23   Q    And have you heard the Court express his concerns

24   about Mr. Sanders being released?

25   A    Yes.

M. Lindsay - Direct

1  Q    Without going into the various arrests or allegations

2  against Mr. Sanders, can you tell the Court or help to

3  address the Court's issues here today about why it is that

4  you believe Mr. Sanders will comply with the Court's

5  conditions upon his release and why he would be a good

6  candidate for release.

7  A    Well, I have spoken -- not just because of this

8  issue -- but I addressed this repeatedly with him.  First

9  of all, I would like to clarify.  He was living with his

10 dad, and he would only come stay with me if he happened to

11 be in my neighborhood.  It wasn't like he was living with

12 me, okay.  So I would like to clarify that.

13          I know that for these last -- I say this last

14 four visits I have had with him, he has confided in me how

15 remorseful he is about what's going on here.  So I know

16 that Rashad is a good candidate for this apprenticeship

17 program.  I'm also having contact with him, and he also

18 wants to get enrolled back in that program.  I know he is

19 a very, very good candidate for that.

20 Q    Can you tell us about the apprenticeship program?

21 What is that about?

22 A    The apprenticeship program is a funded program by the

23 federal government.  It helps young people like Rashad and

24 other young members of the community, and they put them

25 into a program.  They go through a six-week training.  It

1   is for electrician.  It could be for a roofer.  It could

2   be for construction work.  So it is at their own

3   discretion of what they want to choose and to enter into.

4          Once they go through the program, they get paid

5   on a daily basis, a daily program from 8:00 to 3:00,

6   Monday through Friday.  Like I said, it is for six weeks.

7   They have a lot of employers who are construction workers

8   who come in, view the applicants, who are the students,

9   and then hire them on because they get an incentive from

10  the Government to hire these people.  So this is a

11  program.  He is ready and willing to go into.

12  Q    And has, to your knowledge, Mr. Sanders applied to

13  this program?

14  A    Yes, he has.

15  Q    Has he been accepted to the program?

16  A    Yes, he has.

17  Q    Do you know when he could begin that program if he

18  were released?

19  A    I believe the middle of December when the program

20  starts.

21  Q    And do you know what the formal name of the program

22  is?

23  A    Oh, my gosh.  I don't have it by memory.  I just have

24  so much going through my head right now.  I can't recall

25  it off the top of my head right now.  I'm sorry.  I

1   apologize.

2   Q    That's okay.  Ms. Lindsay, did you play a role with

3   your son in getting him enrolled in that program?

4   A    Yes, I did.

5   Q    Can you tell us what your role in that was?

6   A    My role is just not to help my son, but it was very

7   empowering for me to help him, because I see he wasn't

8   working.  He was getting frustrated with not being

9   employed.  He was going to school there for a minute,

10  going to Mt. Hood Community College.  It was a lot of not

11  doing anything with his life.

12          I wanted to see him make something better with

13  his life.  He couldn't get a job because of his

14  background.  I told him the only option he would have is

15  to go into this apprenticeship program, which I got

16  communication from another resource, which is why I'm able

17  to help people like himself to get into the program.

18  Q    The apprenticeship program is a community-based

19  program; is that correct?

20  A    Yes, it is.

21  Q    Do you know what area of town they are based in?

22  A    Yes.  It is on Northeast Ninth.  Ninth Avenue.

23  Q    Ms. Lindsay, if your son, Mr. Sanders, was released

24  from custody and you learned of any information or any

25  information came to your attention indicating to you that

M. Lindsay - Direct                          14

1   Mr. Sanders was not complying with any of the conditions

2   of his release, would you contact the authorities to

3   report that?

4   A    Immediately.  And not to say that just because he is

5   my son, but I have had friends that I tried to help, and I

6   have offered this same service to them.  They did a

7   wonderful job in completing the program in my home.

8              MS. RUSSELL:  Thank you.  I have no further

9   questions.

10             THE COURT:  Cross-examination.

11             MR. STRICKLAND:  Thank you, Your Honor.

12                      CROSS-EXAMINATION

13  BY MR. STRICKLAND:

14  Q    Just a couple of questions:  When exactly,

15  Ms. Lindsay, did you apply for this program?

16  A    Well, it has been a while.  I would say about two

17  months.  You have to wait like three months.  It is every

18  three months that they enroll applicants for the program.

19  I can provide you with that information.

20  Q    So did your son know at the time that you had applied

21  for him?

22  A    Oh, yeah.  He knew probably about three months ago.

23  But the program hasn't started, as I told you, until

24  December.

25  Q    That was a time when he was out of custody?

M. Lindsay - Cross

1  A    Yes.

2  Q    So you were applying for that program when he was out

3  of custody?

4  A    That's correct.  You have to apply for it and then

5  they wait to go into the training.

6  Q    Has he been approved?

7  A    Yes.

8  Q    When was that?

9  A    Oh, gosh.  I want to say at least a month ago, maybe

10 two months ago, because it is not that you just get

11 approved.  You go to the place.  You sign up.  You take a

12 test or do whatever you need to do.  And then they set you

13 up and enroll you, and you come back for the training,

14 which is in December.  Then you come back for the

15 training.

16 Q    So he was approved while he was in custody?

17 A    No, not in custody.

18 Q    He has been in custody --

19 A    Right.

20 Q    -- for the last two months?

21 A    No, no, no.  This happened before he was in custody.

22 Q    But you said he was approved in custody?

23 A    No, no, no.  I am sorry.  I didn't hear you.  No, no,

24 no.  He wasn't approved while he was in custody.  He had

25 been approved like in maybe June, because the program is

16
M. Lindsay - Cross

1    like every three months.  So you have to wait three months

2    in order to get to the program.

3    Q    You are aware of his prior criminal history then?

4    A    I know somewhat of his history when he was on

5    probation at the Southeast 122nd location.

6    Q    You know he was on probation for about five years or

7    so.  You know that, right?

8    A    I don't know how long it was, but I know he was on

9    probation.

10   Q    Were you aware that he has had so many different

11   problems complying with probation?

12   A    He had the problems.  I also intervened because of

13   the issue with his probation officer, because there was a

14   specific incident where he was on a Max, and he got off

15   the Max and there was a problem there.  I also intervened

16   with his probation officer as to why he wasn't complying

17   and showing up for them as well for those visits.

18   Q    The question was:  Were you aware of all the

19   different non-compliant issues?

20   A    Oh, definitely.

21   Q    So then you know that in the past --

22   A    I didn't know it was that many.

23   Q    You didn't know it was that many?

24   A    Oh, heck no.

25   Q    Did you know that he had said things to his probation

M. Lindsay - Cross

1  officer, like he hoped that person would be killed in a

2  car accident on the way home?

3  A    I would never know anything like that.  I'm not in

4  the meeting with him.

5  Q    That he threatened to find the PO's address and

6  provide it to the worst sex offender and send the sex

7  offenders to their house to molest the PO and their

8  children.  Did you know that?

9  A    How would I know that.

10 Q    I'm just asking if you did.

11 A    No.  I wouldn't have known anything.  They won't

12 disclose any of those statements or interviews with me.

13 Q    So with respect to your son, did you know that he was

14 arraigned last Friday?

15 A    Yes.  But I wasn't able to make it.

16 Q    You didn't make it?

17 A    Right.

18 Q    Do you know what any of his conditions were while he

19 is remaining in custody with respect to this case?

20 A    No, not in general.

21 Q    Do you know whether or not he was required or

22 supposed to contact the minor victims that are alleged in

23 the indictment?

24 A    I'm sorry.  What was that?

25 Q    Do you know whether or not he is allowed to contact

M. Lindsay – Cross

1    the minor victims in the indictment?

2    A    He shouldn't be.  I don't know what the indictment or

3    anything says, but I assume he shouldn't be contacting

4    nobody.

5    Q    You believe that a judge might order that?

6    A    He wouldn't have to order it.  I would order it.  He

7    wouldn't contact those people, because that wouldn't be

8    right, especially if they are victims, or assumed victims.

9    I wouldn't allow it.

10   Q    Did you meet with him on Sunday?

11   A    Yes, I did.

12   Q    Did you talk with him?

13   A    Yes.  Uh-huh.

14   Q    Do you have a daughter?

15   A    Yes.

16   Q    What's her name?

17   A    I have three daughters.

18   Q    What are their names?

19   A    Shakina, Damorsha and Shawala (phonetic).

20   Q    Do you know if your son instructed your daughter

21   Shakina to contact the minors in Minnesota?

22   A    No, not at all.

23   Q    I'm sorry?

24   A    No.

25   Q    He did not?

M. Lindsay - Cross

```
 1   A    No, not at all.  I don't know anything, no.

 2           THE COURT:  Your answer is you don't know one

 3   way or the other whether he did that?

 4           THE WITNESS:  I'm saying I don't know.

 5           THE COURT:  Correct.  That's what I understood

 6   you to say.

 7   BY MR. STRICKLAND:

 8   Q    So you would not have had a conversation with your

 9   daughter Shakina about that?

10   A    No.  Why would -- I'm sorry.  No.

11   Q    You wouldn't?

12   A    No.

13   Q    And then you wouldn't have told him that she had

14   contacted those minors or made contact with them?

15   A    No.

16           MR. STRICKLAND:  All right.  That's all the

17   questions I have.

18           THE COURT:  Ms. Russell.  Anything further?

19           MS. RUSSELL:  No, Your Honor.  Thank you.

20           THE COURT:  Thank you, ma'am.  You may step

21   down.  Any other testimony for the defendant?

22           MS. RUSSELL:  No, Your Honor.

23           THE COURT:  Okay.  Any other argument from

24   counsel for either side?

25           MR. STRICKLAND:  I have a witness, Your Honor.
```

M. Lindsay - Cross                                20

1          THE COURT:  Okay.

2          MR. STRICKLAND:  I call Agent Halpin.

3          THE COURT:  Come forward, please, ma'am.  I will

4    swear you in as a witness.

5          (The witness was duly sworn.)

6          THE COURT:  Once you are seated and adjusted the

7    microphone, please state your full name for the record and

8    spell your last name.

9          THE WITNESS:  Masayo Halpin.  M-A-S-A-Y-O,

10   H-A-L-P-I-N.

11         THE COURT:  Thank you.  Your witness, Counsel.

12                   DIRECT EXAMINATION

13   BY MR. STRICKLAND:

14   Q    Agent Halpin, who do you work for?

15   A    I work for the Federal Bureau of Investigations.

16   Q    And what are your duties there?

17   A    I am the innocence lost task force coordinator.  I

18   work human trafficking, specifically minor victims of sex

19   trafficking.

20   Q    Are you working on the case involving Rashad Sanders?

21   A    Yes, I am.

22   Q    And have you had an opportunity to look at the

23   government's memorandum filed today?

24   A    Yes, I have.

25   Q    And did you also have an opportunity to review a

M. Halpin - Direct

1    stack of reports regarding information contained in the

2    exhibits about other minor victims in the memorandum?

3    A    Yes.

4    Q    With respect to Ms. Lindsay, were you able to review

5    jail recorded conversations between her and her son,

6    Rashad Sanders?

7    A    Yes.

8    Q    Were you also able to hear jail-recorded

9    conversations between Shakina, his sister, your daughter,

10   and Rashad Sanders?

11   A    Yes.

12   Q    And based on those conversations were you able to

13   find out whether or not Rashad Sanders instructed his

14   sister, Shakina, to contact the minors in Minnesota?

15   A    Yes.

16   Q    What did you find out?

17   A    He asked his sister to get his cell phone and find

18   the number and contact them and talk to them, and she,

19   through her mother, did make contact with them and

20   everything was taken care of.

21   Q    So did you hear a conversation between Ms. Lindsay

22   and her son describing whether or not that contact took

23   place?

24   A    Yes.

25   Q    And what do you remember hearing in that

M. Halpin – Direct

1   conversation?

2   A   I believe Mr. Sanders asked Ms. Lindsay if it was

3   taken care of, and she stated, yes, that her daughter had

4   taken care of it and had made a call to one of the girls

5   in Minnesota and that she was waiting for a call back.

6           MR. STRICKLAND:  All right.  That's all the

7   questions I have.

8           THE COURT:  Cross-examination.

9           MS. RUSSELL:  Yes, thank you.

10              CROSS-EXAMINATION

11  BY MS. RUSSELL:

12  Q   These conversations you are referring to, they are

13  recorded conversations?

14  A   Yes.

15  Q   Those were conversations that took place at the

16  Inverness Jail; is that correct?

17  A   They were recorded through Multnomah County Detention

18  Center.  I'm not sure if it was Inverness or downtown.

19  Q   Okay.  Are we talking about multiple conversations?

20  A   Yes.

21  Q   And do you know what date these conversations took

22  place?

23  A   I believe the two conversations that were the visits

24  that discussed making contact with the victims were

25  November 6th, and then it would have been this past

M. Halpin – Cross

23

1    Sunday.  I can't think of the date right off.

2    Q    Those were telephone conversations or they were

3    recorded visits?

4    A    They were visits.

5    Q    And who were those visits between?

6    A    Mr. Sanders, Ms. Lindsay and her daughter -- her

7    daughter.  I don't know the name -- Sha --

8            MR. STRICKLAND:  Shakina.

9            THE WITNESS:  Shakina.

10   BY MS. RUSSELL:

11   Q    Those three individuals were present at both the

12   November 6th visit and the one last Sunday?

13   A    No, I believe the one last Sunday was just

14   Ms. Lindsay, but they were all present at the

15   November 6th visit.

16   Q    And the conversation about asking -- in which

17   Mr. Sanders supposedly asked his sister, Shakina, to get

18   the number from his cell phone, is that a conversation

19   that you are referencing that took place on

20   November 6th in a personal visit at the jail?

21   A    Yes.

22   Q    The other conversation you are referencing, where I

23   think in your words you paraphrased, "everything was taken

24   care of," that took place last Sunday?

25   A    Yes.  That was the more recent visit.

M. Halpin - Cross

24

```
 1   Q    The conversations that you are referring took place

 2   during those two visits, is that correct, or are there

 3   other conversations, for example, by phone that you are

 4   referencing?

 5   A    No.  I'm talking about the two visits.

 6            MS. RUSSELL:  If I could have a moment.  I have

 7   no other questions.  Thank you.

 8            THE COURT:  Anything further?

 9            MR. STRICKLAND:  Nothing further, Your Honor.

10            THE COURT:  You may step down.

11            THE WITNESS:  Thank you.

12            THE COURT:  Any other witnesses for the

13   government?

14            MR. STRICKLAND:  No, Your Honor.

15            THE COURT:  Any other evidence from the

16   defendant?

17            MS. RUSSELL:  No, Your Honor.

18            THE COURT:  Okay.  Any more argument?  I'll

19   start with the Government.

20            MR. STRICKLAND:  Your Honor, the presumption is

21   against his detention.  As the Court pointed out --

22            THE COURT:  Against his detention?

23            MR. STRICKLAND:  Against his release, I'm sorry.

24   As the Court pointed out, my memorandum suggests that

25   there hasn't been anything offered here to rebut that
```

presumption or to provide evidence to the Court.  It is

quite troubling, too, that Mr. Sanders has already

violated the conditions this Court provided him or gave

him on Friday, a condition I specifically asked for,

because knowing his history and background and

characteristics, knew he would try to reach out to these

victims, and that's exactly what he did.  I would ask that

he be held in custody pending trial.

THE COURT:  Ms. Russell.

MS. RUSSELL:  Thank you, Your Honor.  We would

ask that Mr. Sanders be released and be released to reside

at a halfway house; that he be allowed to participate in

the apprenticeship program.  We have referenced two

conversations that took place.  By my calculations, the

first conversation, assuming that it does -- I'm going to

withdraw my comments on that.  We would simply ask that

Mr. Sanders be released under the strict conditions that

we have proposed.

THE COURT:  The burden in this situation, with

the presumption that the charges carry with them, is on

the defendant to come forward with some evidence

indicating that he is not a danger to the community and

not a risk of non-appearance.  I don't have any evidence

from which I can draw that conclusion, even though the

burden of persuasion remains on the government with the

benefit of the presumption.  They have carried that burden

of persuasion.  Quite frankly, they carried it before we

got into the issue about the attempted contact, and

perhaps now successful contact with the minor victims.

That only made it much more difficult for the defendant to

convince this Court that he is anything but a danger to

the community.

So I'm going to order that he continue to be

detained until trial.  Nothing precludes the defendant,

however, from asking the Court to review that if he has

new information to present at a later time.  As you

suggested in part of your comments, Ms. Russell, you might

be able to address things more fully when you have got

discovery in the case and started down the road of your

investigation.  If you want to come back to Court at some

point, you certainly can.  But the order of the Court

today is that he is going to be detained and that the

prior rulings stand; that he is both a danger and a risk

of non-appearance.

Let me just address one other thing,

Mr. Sanders.  I don't want any misunderstandings between

you and I at all.  If you ask anyone to do anything to

communicate with the victims -- alleged victims of this

crime -- you are violating the order of this Court, and I

would hope that any judge that you come before that hears

1    evidence of that, such as I have heard here today, would

2    take it into serious consideration and evaluate very

3    seriously and closely, whether there is any conditions you

4    are willing to abide by.  You won't even apparently abide

5    by conditions when you are in custody.  So why a judge

6    would believe you would adhere to conditions when you are

7    out of custody is very hard for this judge to understand.

8    Now, I hope you get the message:  Knock it off.

9              That's all.

10             MR. STRICKLAND:  Thank you, Your Honor.

11             (End of proceedings.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

--oOo--


         I certify, by signing below, that the foregoing

is a correct transcript of the record of proceedings in

the above-entitled cause.  A transcript without an

original signature is not certified.


/s/ Dennis W. Apodaca                  November 30, 2011
DENNIS W. APODACA, RMR, FCRR, RPR                 DATE
Official Court Reporter